IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **WILLIE S. HERRING,** | Case No. 4:16 CV 2626 |
| Petitioner, | Judge Jack Zouhary |
| v. | Magistrate Judge James R. Knepp, II |
| **ALAN J. LAZAROFF,** | |
| Respondent. | REPORT AND RECOMMENDATION |

## INTRODUCTION

Petitioner Willie S. Herring ("Petitioner"), a prisoner in state custody represented by counsel, filed a petition seeking a writ of habeas corpus under 28 U.S.C. § 2254 ("Petition"). (Doc. 1). Respondent Warden Alan J. Lazaroff ("Respondent") filed an Answer / Return of Writ (Doc. 6) and Petitioner filed a Reply / Traverse (Doc. 9).[1] The district court has jurisdiction over the Petition under § 2254(a). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(2). (Non-document entry dated October 28, 2016). For the reasons discussed below, the undersigned recommends the Petition be denied.

## FACTUAL BACKGROUND

For the purposes of habeas corpus review of state court decisions, findings of fact made by a state court are presumed correct and can only be contravened if the habeas petitioner shows, by clear and convincing evidence, erroneous factual findings by the state court. 28 U.S.C. § 2254(e)(1); *Moore v. Mitchell*, 708 F.3d 760, 775 (6th Cir. 2013); *Mitzel v. Tate*, 267 F.3d 524,

---

1. Parties and Courts commonly use the terms "Return of Writ" and "Traverse" to refer to what the Rules Governing Section 2254 Cases now term an "Answer" and "Reply". *See* Rule 5 of the Rules Governing Section 2254 Cases.

530 (6th Cir. 2001). This presumption of correctness applies to factual findings made by a state court of appeals based on the state trial court record. *Mitzel*, 267 F.3d at 530. The Ohio Supreme Court set forth the following facts on direct appeal:

> Shortly after midnight on April 30, 1996, five masked gunmen intent on robbery entered the Newport Inn, a bar in Youngstown. They shot five people, robbed the till, and left. Three of the five victims died. One of the gunmen, Willie S. "Stevie" Herring, is the appellant in this case. He was convicted of three counts of aggravated murder and sentenced to death on each count.

> Herring's partners in crime were Adelbert Callahan, Antwan Jones, Eugene Foose, Louis Allen, and Kitwan Dalton. On the night of April 29, 1996, these five gathered at Herring's house. At one point, Callahan and Jones left the house for about fifteen minutes before returning with a stolen van.

> Herring and the others got into the van, Callahan taking the wheel. Callahan drove to a blue house on Laclede Avenue near Hillman Street and Rosedale Avenue. Herring went inside the blue house and came back with four guns. He gave a .38 special to Allen, a 9 mm pistol to Callahan, and a .357–caliber pistol to Jones. He did not give a gun to Foose, who was already carrying a .45, or to Dalton, who was to be the getaway driver. Herring kept a 9 mm Cobray semiautomatic for himself.

> Herring then said to the others, "If you all know like I know, then you all want to get paid." It turned out that all six needed money. They therefore decided to commit a robbery. Foose suggested the Newport Inn as a target. Callahan drove the van there.

> Everyone but Dalton got out of the van carrying a gun. They put on disguises. Herring donned a white Halloween mask, which Dalton agreed was a "store-bought" mask similar to one seen in "slasher" movies. No one else had such a mask; the others hid their faces with bandanas or, in Allen's case, a T-shirt. Herring, Allen, and Foose went to the back door of the Newport Inn; Callahan and Jones took the front door.

> Ronald Marinelli, the Newport Inn's owner, was tending bar that night. He had six or eight customers, including Deborah Aziz, Herman Naze, Sr., Dennis Kotheimer, and Jimmie Lee Jones. Jones was sitting with a woman at a table in the back.

> Sometime between 1:45 and 2:15 a.m., the robbers burst in. Hearing a sound like a gunshot, Marinelli looked and saw four armed black males in the bar. The two at the front door were disguised in dark bandanas. One carried a revolver; one had what looked to Marinelli like a 9 mm semiautomatic pistol. Marinelli saw two more at the rear. One wore a bandana, the other a "white hockey-type mask." Herring, in the white mask, carried a "very distinctive" gun, which looked like an Uzi or a

2

MAC–10, squarish in shape, with a long clip. Allen, entering last through the back door, saw Jimmie Lee Jones already lying on the floor. At a nearby table, a woman was screaming. Allen told her to be quiet. Then he returned to the van.

One of the other gunmen ordered Herman Naze: "Give me your fucking money." "I don't have any money," Naze replied. The gunman immediately shot him. Then Herring shot Deborah Aziz, who fell to the floor. She managed to crawl away and hide between a cooler and a trash can. She later described her assailant's mask as "a hard plastic, like one of those Jason masks."

Now Herring walked around the end of the horseshoe bar toward Marinelli and the cash register. As he approached, he shot Marinelli four times in the stomach from about five feet away.

Somehow Marinelli managed to stay on his feet as Herring came closer. Herring stopped about a foot away from him. Marinelli noticed his assailant's long reddish-orange hair. Despite the mask, Marinelli could also see that his assailant had an "odd skin pigment," large eyes "almost like a hazel" color, and buckteeth.

Herring said, "Give me your fucking money." Despite his wounds, Marinelli obeyed, handing over the cash in the register. But the robber screamed that Marinelli hadn't given him everything. He had guessed right: in a nearby drawer there was some cash belonging to a pool league.

As Herring threatened to "blow [Marinelli's] brains out," Marinelli gave him the money from the drawer. Herring screamed for more. Marinelli urged him to "[b]e cool" and told him there was no more. Herring responded by leveling his gun at Marinelli's head.

Marinelli reached into the drawer again. This time, he pulled out a gun of his own. But by now, Marinelli was so weak that Herring easily took the gun from him. Marinelli collapsed. Herring said, "You ain't dead yet, motherfucker," and shot Marinelli in the legs as he lay on the floor.

After Herring shot Marinelli, Aziz heard Dennis Kotheimer say, "You motherfucker." Then she heard more shots. Marinelli saw Kotheimer get shot but did not see who shot him. Nobody saw who shot Jimmie Lee Jones.

Someone reported the gunshots to the Youngstown police, and officers were sent to the Newport Inn. When the officers saw the carnage inside, they summoned emergency personnel.

The five shooting victims were taken to a Youngstown hospital. Herman Naze and Jimmie Lee Jones were both pronounced dead on the morning of April 30. Dennis Kotheimer died on May 1.

Autopsies showed that each victim died of gunshot wounds to the trunk. Jones had been shot twice; one 9 mm slug was recovered from his body. Kotheimer and Naze had each been shot once, but no bullets were recovered from either victim.

On May 7, 1996, Officer Daniel Mikus responded to a report of an unruly juvenile at 641 West Laclede Avenue. There, Mikus confronted sixteen-year-old Obie Crockett, who was sitting on a couch with his hand concealed under a pillow. Mikus looked under the pillow and found State's Exhibit 5, a 9 mm semiautomatic firearm. A forensic scientist at the Bureau of Criminal Identification and Investigation later determined that State's Exhibit 5 had fired the 9 mm slug recovered from the body of Jimmie Lee Jones.

*State v. Herring*, 94 Ohio St. 3d 246, 246-48 (2002) ("*Herring I*").

## PROCEDURAL HISTORY

State Court Conviction

A Mahoning County Grand Jury indicted Petitioner in July 1996 on three counts of aggravated murder in violation of Ohio Revised Code § 2903.01(B)(C) (Counts 1-3); two counts of attempted aggravated murder in violation of § 2923.02(A)(E) & § 2903.01(B)(C); two counts of aggravated robbery in violation of § 2911.01(A)(1)(B). (Ex. 1, Doc. 6-1, at 5-10). The charges included death penalty specifications (purposeful killing of, or attempt to kill, two or more persons), and firearm specifications. *See id.* Petitioner entered a plea of not guilty to all charges. (Ex. 2, Doc. 6-1, at 11).

Following a trial, a jury found Petitioner not guilty of aggravated murder on Count 1, but guilty of complicity to commit aggravated murder on Counts 1 through 3. (Ex. 3, Doc. 6-1, at 12-14). The jury also found Petitioner guilty on Counts 4 through 7, and of all firearm and death specifications. *Id.*

Petitioner filed a motion for judgment of acquittal on Counts 1 through 3, arguing a jury instruction was contrary to law. (Ex. 4, Doc. 6-1, at 15-17). Specifically, Petitioner pointed to the following instructions:

4

> You may not convict Willie S. Herring of complicity to commit aggravated murder unless you find beyond a reasonable doubt that he specifically intended to aid and abet another in causing the death of [name of victim in each count].

*Id.* at 16. The trial court denied the motion. (Ex. 5, Doc. 6-1, at 23).

In February 1998, the court accepted the jury's recommendation of a death sentence on Counts 1 through 3. (Ex. 6, Doc. 6-1, at 24). In addition, the court imposed consecutive sentences of 10 to 25 years each on Counts 4 through 7. *Id.* at 26-27. Further, the court merged the firearm specifications and sentenced Petitioner to an additional consecutive three years' imprisonment. *Id.* The trial court also made the required specific findings regarding aggravating and mitigating factors. (Ex. 7, Doc. 6-1, at 28-32).

Direct Appeal

Petitioner, through counsel, filed a direct appeal to the Ohio Supreme Court. (Exs. 8-9, Doc. 6-1, at 33-239). He raised 21 propositions of law:

1. A conviction for complicity to commit aggravated murder cannot stand when the trial court fails to instruct the jury that in order to find the defendant guilty, the jury must find that the defendant possessed the necessary element of intent to kill. U.S. Const. Amend. XIV.

2. Willie Herring's death sentence is unconstitutional under the Eighth Amendment and the due process clause of the Fourteenth Amendment because there is no finding that Appellant Herring killed, attempted to kill, or intended to kill Jimmie Lee Jones, Herman Naze, or Dennis Kotheimer. U.S. Const. Amends. VIII, XIV.

3. Ohio law does not allow an accomplice who neither acts with prior calculation and design nor who is the actual killer to be subject to the death penalty. R.C. 2929.04(a)(5)

4. When the state proceeds exclusively on a theory that the defendant is the principal offender of an aggravated murder, it is error for the trial court to instruct the jury on complicity and for the jury to render a verdict on the complicity charge. U.S. Const. XIV.

5. A trial court's instructions, which require a jury to unanimously determine the appropriateness of a death sentence before the jury is allowed to consider life

5

sentencing options violates a capital defendant's rights. U.S. Const. Amendments V, VIII, XIV.

6. A defendant's right to equal protection of the law and to a fair trial is violated when a prosecutor uses peremptory challenges to remove a black juror from the jury on account of race. U.S. Const. Amend. XIV.

7. A defendant is denied his right to a fair cross-section of the jury under the Sixth Amendment and his right to due process of law when the actions of the jury commissioner deprive him of an opportunity to prove an underrepresentation of minorities in the venire from which his petit jury was drawn. U.S. Const. Amends. VI, XIV.

8. A conviction on an aggravated murder charge cannot stand when the evidence is insufficient to demonstrate the identity of the defendant as the individual who committed the murder and when the evidence is insufficient to demonstrate that the defendant acted with intent to kill the victims. U.S. Const. Amend. XIV.

9. A capital defendant is denied his due process right to a fair sentencing jury where a juror receives harassing telephone calls prior to and during the mitigation phase of a trial from a codefendant. U.S. Const. Amend. XIV.

10. In denying defendant's motion for a mistrial based on the surprise identification testimony identifying defendant as the shooter of an attempted aggravated murder and in denying defense's exhibit contradicted the witness' testimony, the trial court denied defendant the right to a fair trial in contravention of the Sixth and Fourteenth Amendments to the United States Constitution and Article I, § 10 of the Ohio Constitution.

11. Prosecutorial misconduct rendered Willie Herring's trial fundamentally unfair resulting in a denial of due process of law. U.S. Const. Amend. VI, XIV.

12. When the trial court precludes a capital defendant from pursuing and presenting relevant mitigation evidence, a capital defendant's rights to a fair sentencing proceeding and individualized sentencing as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution and §§ 9 and 16, Article I of the Ohio Constitution are violated.

13. The failure of the trial court to secure the presence of the accused or to obtain a waiver of such right when the trial judge communicates with the jury, violates the accused's right under the Sixth and Fourteenth Amendment[s] to the United States Constitution.

14. Jury instructions which create a mandatory presumption, permits the jury to convict without finding the accused guilty of the mens rea element and permits

the jury to convict upon a standard of proof that is proper only in civil cases thus relieving the State of its burden of proof on essential elements, violates the Eighth and Fourteenth Amendments to the United States Constitution.

15. When trial counsel fails to ensure appellant's presence when the judge communicates with the jury, fails to object to improper jury instructions during both the trial and mitigation phase, fails to make appropriate objections during both trial and mitigation phase, presents damaging evidence on appellant's behalf, and fails to adequately prepare for and present all relevant mitigation on behalf of a capital defendant, the capital defendant is deprived of the right to the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, §§ 10 and 16 of the Ohio Constitution.

16. A capital defendant's rights under the Eighth and Fourteenth Amendments are violated when a noncapital victim gives the trial court victim impact testimony in the form of an ultimate opinion on the defendant's fate.

17. The accused's right to due process and an individualized sentencing determination is violated when the trial court instructs the jury that mitigating factors are related to a defendant's culpability and when the trial court fails to instruct the jury that the use of the word recommend does not diminish the jury's responsibility for its verdict. U.S. Const. Amend. V, VIII, XIV.

18. When a trial court erroneously weighs aggravating factors and groups aggravating circumstances together in a case with multiple counts and does not consider all mitigating factors, a defendant is deprived of his right to a reliable sentencing determination and due process of law. U.S. Const. Amends. VIII, XIV.

19. The accused's right to due process under the Fourteenth Amendment to the United States Constitution is violated when the State is permitted to convict upon a standard of proof beyond a reasonable doubt.

20. When the death sentence is disproportionate to the sentences received by the codefendants in the same crime, the death sentence must be vacated and a life sentence imposed. Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, §§ 9, 10 and 16 of the Ohio Constitution.

21. Ohio death penalty law is unconstitutional. The Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and §§ 2, 9, 10 and 16, Article I of the Ohio Constitution establish the requirements for a valid death penalty scheme. Ohio Rev. Code Ann. §§ 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04 and 2929.05, (*Anderson* 1996), do not meet the prescribed constitutional requirements and  are unconstitutional on

their face and as applied to Willie Herring.

*Id.* The state filed a brief in response (Ex. 11, Doc. 6-2, at 8-109). In February 2002, the Ohio

Supreme Court affirmed Petitioner's convictions and sentence. (Ex. 12, Doc. 6-2, at 110-39);

*Herring I*, 94 Ohio St. 3d 246. Petitioner's subsequent motion for reconsideration (Ex. 13, Doc. 6-2, at 140-51), was denied (Ex. 15, Doc. 6-2, at 158). Petitioner also filed a petition for a writ of

certiorari in the United States Supreme Court (Ex. 16, Doc. 6-2, at 159), which was denied (Ex.

17, Doc. 6-2, at 160).

State Post-Conviction Proceedings

During the pendency of his direct appeal, Petitioner (through counsel) filed a post-conviction petition pursuant to Ohio Revised Code § 2953.21. (Ex. 18, Doc. 6-3). In it, he raised

the following claims relevant to the instant Petition:

14. The judgment and sentence against Willie Herring are void or voidable because he did not receive the effective assistance of counsel during his capital trial. Counsel fell below a minimum standard of reasonable legal representation for failing to present information critical to Willie Herring's defense, specifically expert testimony regarding eyewitnesses.

15. The judgment and sentence against Willie Herring are void or voidable because he did not receive the effective assistance of counsel during his capital trial. Counsel fell below a minimum standard of reasonable legal representation for failing to present information critical to Willie Herring's defense, specifically testimony that Ronald Marinelli committed perjury in identifying Willie Herring as the person who shot him.

16. The judgment and sentence against Willie Herring are void or voidable because the juror misconduct that occurred during his capital trial denied him a fair and impartial determination of his guilt in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United States and Article I, Sections 1, 2, 5, 9, 10, 16, and 20 of the Ohio Constitution.

17. The judgment and sentence against Willie Herring are void or voidable because of errors committed by the trial court, and because Mr. Herring did not receive the effective assistance of counsel during the culpability and penalty phases of the trial. The trial court erred when it gave instructions that allowed the jury to consider the death penalty when Mr. Herring had only been convicted of

complicity to aggravated murder. The court further erred when it improperly instructed the jury regarding reasonable doubt, as well as their consideration of life sentences. These erroneous jury instructions violated Petitioner's right to Due Process. Counsel fell below a minimum standard of reasonable legal representation by failing to object to the trial court's erroneous instructions, which prejudiced Petitioner by allowing his jury to use improper standards to convict him and issue a verdict of death.

*Id.* at 61-71. The state filed a motion for summary judgment. (Ex. 19, Doc. 6-4, at 5-11). On January 6, 2003, the trial court issued a Judgment Entry containing findings of fact and conclusions of law. (Ex. 20, Doc. 6-4, at 12-17). Therein, the court denied Petitioner's request for an evidentiary hearing, and granted the state's motion for summary judgment. *Id.*

Petitioner filed a timely appeal with the Seventh District Court of Appeals. (Ex. 21, Doc. 6-4, at 18-19). In his merit brief, he raised three assignments of error:

1. The trial court erred in dismissing Appellant's post-conviction petition where he presented sufficient operative facts to merit an evidentiary hearing and discovery in violation of Appellant's rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

2. In Appellant's case Ohio's post-conviction procedures afforded neither an adequate corrective process nor complied with Due Process and Equal Protection.

3. The effect of the cumulative error derived from appellant's substantive claims merit reversal or remand for a new trial and sentencing hearing or an adequate postconviction corrective process pursuant.

(Ex. 22, Doc. 6-4, at 21) (capitalization altered). The state filed a brief in response (Ex. 23, Doc. 6-4, at 110-41), and Petitioner replied (Ex. 24, Doc. 6-4, at 142-51). On October 1, 2004, the appellate court sustained Petitioner's first ground for relief, remanding the matter back to the trial court for an evidentiary hearing regarding defense counsel's decision not to present certain mitigating evidence during sentencing, but affirmed the trial court's denial of relief on Petitioner's other grounds. (Ex. 25, Doc. 6-4, at 152-90); *State v. Herring*, 2004 WL 2334325 (Ohio Ct. App.) ("*Herring II*"). Petitioner filed an appeal to the Ohio Supreme Court of the non-remanded grounds.

9

(Ex. 26, Doc. 6-4, at 191-93). In his memorandum in support of jurisdiction, Petitioner set forth three propositions of law:

1. The trial court erred in dismissing Appellant's post-conviction petition where he presented sufficient operative facts to merit an evidentiary hearing and discovery in violation of Appellant's rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

2. In Appellant's case Ohio's post-conviction procedures afforded neither an adequate corrective process nor complied with due process and equal protection.

3. The effect of the cumulative error derived from Appellant's substantive claims merit reversal or remand for a new trial and sentencing hearing or an adequate postconviction corrective process pursuant.

(Ex. 27, Doc. 6-5, at 6) (capitalization altered). The state opposed jurisdiction (Ex. 28, Doc. 6-5, at 73-86), and on February 2, 2005, the Ohio Supreme Court declined jurisdiction and dismissed the appeal as not involving any substantial constitutional question (Ex. 29, Doc. 6-5, at 87).

Following an evidentiary hearing on remand, the trial court concluded trial counsel's decision to present only positive mitigation evidence was objectively reasonable, and denied Petitioner's post-conviction petition a second time. (Ex. 30, Doc. 6-5, at 88-90). Petitioner again appealed, and the appellate court rejected the trial court's reasoning. (Ex. 31, Doc. 6-5, at 91-112); *State v. Herring*, 2011 WL 497765 (Ohio Ct. App.) ("*Herring III*"). The appellate court held trial counsel's mitigation investigation was inadequate and granted Petitioner's post-conviction petition on this issue. *See id.* The court reversed Petitioner's death sentence and remanded to the trial court for a new sentencing hearing for a jury to determine whether to impose a death sentence or life in prison. *Id.* at 112. This determination was upheld by the Ohio Supreme Court on the state's appeal. (Ex. 32, Doc. 6-5, at 113-66); *State v. Herring*, 142 Ohio St. 3d 165 (Ohio 2014) ("*Herring IV*").

On remand before the trial court, the state filed a motion for leave to dismiss the capital specifications for Counts 1-3. (Ex. 33, Doc. 6-5, at 167). The trial court granted the motion. (Ex.

10

34, Doc. 6-5, at 169. On October 15, 2015, the trial court sentenced Petitioner to twenty years to life in prison each for Counts 1-3, ten to twenty-five years in prison each for Counts 5-7, and three years for the merged firearm specifications. (Ex. 35, Doc. 6-5, at 170-71). The terms were to be served consecutively for an aggregate sentence of 103 years to life, and Petitioner waived his right to appointment of appellate counsel. *Id.* at 171. On October 28, 2015, the trial court amended its sentencing entry to include a consecutive 10-25 year sentence for Count 4. (Ex. 36, Doc. 6-5, at 172-73).

## FEDERAL HABEAS CORPUS

In October 2016, Petitioner timely filed the instant Petition. (Doc. 1). In it, he raises the following grounds for relief:

1. Herring is entitled to habeas relief because improper jury instructions regarding an essential element of the offense denied him his constitutional right to a fair trial. U.S. Const. amend. XIV.

2. Herring is entitled to habeas relief because juror misconduct denied him a fair and impartial determination of his guilt. U.S. Const. amends. V, VI, VIII, and XIV.

3. Herring is entitled to habeas relief because of trial counsel's ineffectiveness.

   A. Counsel were ineffective to Herring's prejudice when they failed to make appropriate objections during the course of Herring's trial.

      (1) Failed to object to the trial court's instructions on purpose and causation.

      (2) Failed to ensure that Herring was present when the trial court communicated with the jury.

      (3) Failed to object to numerous instances of prosecutorial misconduct. *See* Fourth Ground for Relief.

      (4) Failed to object to the trial court's use of Ohio's statutory definition of reasonable doubt. *See* Sixth Ground for Relief.[2]

---

2. These sub-grounds are labeled: (1), (2), (2), (3) in the Petition, *see* Doc. 1-1, at 18, and have been renumbered here for clarity.

B. Counsel were ineffective to Herring's prejudice when they introduced prejudicial evidence in the defense case-in-chief and failed to object to the State's use of this prejudicial evidence.

C. Counsel were ineffective to Herring's prejudice when they failed to retain and utilize an expert in eyewitness investigation during Herring's trial.

D. Counsel were ineffective to Herring's prejudice when they failed to present evidence that State's witness Ronald Marinelli's [sic] testified falsely.

E. Counsel were ineffective to Herring's prejudice when they failed to present evidence to challenge State's witness Ronald Marinelli's testimony regarding the number of times he had been shot.

F. Counsel were ineffective to Herring's prejudice when they failed to present evidence to challenge State's witness Ronald Marinelli's testimony regarding the statement he claims Herring made.

G. Counsel were ineffective to Herring's prejudice when they failed to challenge State's witness Ronald Marinelli's description of the man in the white mask and resultant identification of Herring as that man.

4. Herring is entitled to habeas relief because prejudicial prosecutorial misconduct rendered his trial unfair. U.S. Const. amends VI and XIV.

   A. Prosecutorial Misconduct during closing argument.

   B. Prosecutorial Misconduct relevant to Ronald Marinelli
      .

5. Herring is entitled to habeas relief because the prosecutor removed jurors based on race in violation of Herring's right to equal protection and right to fair trial. U.S. Const. amend. XIV

6. Herring is entitled to habeas relief because the trial court instructed on a statutory definition of reasonable doubt which allowed the jury to convict using a standard below proof beyond a reasonable doubt. U.S. Const. amend XIV.

(Docs 1, 1-1). Respondent filed an Answer/Return of Writ (Doc. 6), with attached state court record (Docs. 6-1 to 6-5), and transcripts (Docs. 7-1 to 7-23).

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "dictates a highly deferential standard for evaluating state-court rulings which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (internal citations and quotations omitted). An application for habeas corpus cannot be granted for a person in custody pursuant to a state conviction unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d). Thus, a court may only grant habeas relief if the state court arrives at a conclusion that is contrary to a decision of the Supreme Court on a question of law, or if the state court decides a case differently than did the Supreme Court on a materially indistinguishable set of facts. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

The appropriate measure of whether a state court decision unreasonably applied clearly established federal law is whether that state adjudication was "objectively unreasonable" and not merely erroneous or incorrect. *Williams*, 529 U.S. at 409-11; *see also Machacek v. Hofbauer*, 213 F.3d 947, 953 (6th Cir. 2000). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). To obtain "habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

DISCUSSION

Petitioner raises six grounds for relief. Respondent contends Grounds 3(A)(4), 3(E), 3(F), 3(G), 4(B), and 6 are procedurally defaulted, and the remaining grounds fail under the AEDPA standard of review. Petitioner concedes the default of Grounds 3(E), 3(F), 3(G), 4(B), and 6, but not 3(A)(4). Additionally, he asserts he can show cause and prejudice (in the form of ineffective assistance of counsel) to overcome each default. And, he contends, he is entitled to relief on the merits. For the reasons discussed below, the undersigned recommends the Petition be denied in its entirety.

Procedural Default

Respondent contends Grounds 3(A)(4), 3(E), 3(F), 3(G), 4(B), and 6 are procedurally defaulted. (Doc. 6, at 16-21). In Reply, Petitioner concedes the default of Grounds 3(E), 3(F), 3(G), 4(B), and 6, but asserts he can show cause and prejudice to overcome the procedural bar. (Doc. 9, at 6-17). Petitioner also asserts Ground 3(A)(4) was properly raised and not defaulted. *Id.* at 9.

Petitioners must exhaust state court remedies prior to raising claims in federal habeas corpus proceedings. *See* 28 U.S.C. § 2254(b), (c). This requirement is satisfied when a petitioner has given "the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the state's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). The doctrine of exhaustion "requires that a claim be presented to the state courts under the same theory in which it is later presented in federal court." *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998). A claim cannot rest on a legal theory which is separate and distinct from the one previously considered and rejected in state court. *Id.*; *see also Williams v. Wolfenberger*, 513 F. App'x 466, 68 (6th Cir. 2013).

14

A procedural default occurs when a petitioner fails to fairly present his claims in a federal constitutional context to the highest state court. *O'Sullivan,* 526 U.S. at 842; *Anderson v. Harless,* 459 U.S. 4 (1982). In Ohio, "one complete round of the State's established appellate review process" means a defendant must fairly present his constitutional claims, on the record, to the trial court, the court of appeals, and the Supreme Court of Ohio on direct appeal. *Caver v. Straub,* 349 F.3d 340, 346 (6th Cir. 2003) (quoting *O'Sullivan,* 526 U.S. at 845). This is to "[alert] [the state court] to the fact that the prisoner[] [is] asserting claims under the United States Constitution." *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995) (internal quotation marks omitted) (citations omitted). In order to accomplish this, a petitioner must fairly present the substance of his federal constitutional claims to the state courts before obtaining habeas relief. *Whitings v. Burt*, 395 F.3d 602, 612 (6th Cir. 2005) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)). Hence, "a habeas petitioner must present both the factual and legal underpinnings of his claims to the state courts." *Id.* (quoting *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)). Further, the claim must be presented to the state courts as a federal constitutional issue, not merely as an issue arising under state law. *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984).

If the state argues a petitioner has procedurally defaulted his claims, the Court must conduct a four-step analysis to determine whether the petitioner has indeed defaulted and, if so, whether the procedural default may be excused:

1. The Court determines whether there is a procedural rule applicable to the claim at issue, and whether the petitioner in fact failed to follow it;

2. The Court then determines whether the state courts actually enforced their procedural sanction;

3. The Court then decides whether the state's procedural forfeit is an "adequate and independent ground" on which the state can rely to foreclose federal review; and

    4.   Finally, in order to avoid default, the petitioner can demonstrate that there was "cause" for him to neglect the procedural rule, and that he was actually prejudiced by the alleged constitutional error.

*Maupin v. Smith,* 785 F.2d 135, 138 (6th Cir. 1986).

Demonstrating "cause" requires a petitioner to "show that 'some objective factor external to the defense' prevented the petitioner's compliance with a state procedural rule." *Bonilla v. Hurley,* 370 F.3d 494, 498 (6th Cir. 2004) (quoting *Murray v. Carrier,* 477 U.S. 478, 488 (1986)). Demonstrating prejudice requires a petitioner to show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady,* 456 U.S. 152, 170 (1982) (emphasis in original).

A procedural default will also be excused if the petitioner demonstrates that not excusing the default "will result in a fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722, 750 (1991). The Supreme Court has held that such an inquiry requires a petitioner "supplement[ ] a constitutional claim with a 'colorable showing of factual innocence.' " *McCleskey v. Zant*, 499 U.S. 467, 495 (1991) (quoting *Kuhlmann v. Wilson,* 477 U.S. 436, 454 (1986)). Maintaining this exception to the rule against reviewing procedurally defaulted claims serves as "an additional safeguard against compelling an innocent man to suffer an unconstitutional loss of liberty". *Id.* (quoting *Stone v. Powell,* 428 U.S. 465, 492-93 (1976)).

**Grounds 3(E), 3(F), and 3(G)**

In these Grounds, Petitioner asserts trial counsel was ineffective in failing to challenge witness Ronald Marinelli's testimony in three ways: 1) regarding the number of times he was shot; 2) regarding the statement he claimed Petitioner made; and 3) regarding the description of the man in the white mask and resultant identification of Petitioner as that man. (Doc. 1-1, at 23-35).

16

Petitioner asserts these claims are based on evidence outside of Petitioner's trial record, and thus could not have been raised on direct appeal. He concedes they are defaulted, but asserts he can overcome the default through a showing of ineffective assistance of post-conviction counsel.

Petitioner did not present the factual basis for these claims to the state courts either on direct appeal, or in his post-conviction petition. *See* Ex. 9, Doc. 6-1, at 181-82 (asserting on direct appeal trial counsel was ineffective for different reasons); Ex. 18, Doc. 6-3, at 61-65 (asserting in post-conviction proceedings that trial counsel was ineffective for different reasons). Because Petitioner did not fairly present these claims to the Ohio courts, and he cannot do so now, they are procedurally defaulted. *See* 28 U.S.C. § 2254 (b), (c); *Rust v. Zent*, 17 F.3d 155, 160-61 (6th Cir. 1994); *Gray v. Netherland*, 518 U.S. 152, 161-62 (1996); *O'Sullivan,* 526 U.S. at 842. Thus, the court may not consider the merits of these grounds unless Petitioner can show cause and prejudice to excuse his default. *Murray*, 477 U.S. at 485.

*Cause & Prejudice*

As cause to overcome this procedural default, Petitioner asserts first, that such claims were based on evidence *outside his trial record*, and thus could only have been presented in a post-conviction Petition. (Doc. 9, at 9-10). Petitioner asserts ineffective assistance of post-conviction counsel serves as his cause and prejudice to overcome the default.

Respondent, on the other hand, contends these claims should have been raised on direct appeal. (Doc. 6, at 17-18). He asserts, ineffective assistance of post-conviction counsel cannot serve as cause because counsel is not required to raise meritless claims, and these claims would have been barred by *res judicata* for failure to raise them on direct appeal.

The undersigned first agrees with Petitioner that these claims of ineffective assistance of trial counsel—based on evidence outside Petitioner's trial record—could not have been raised on

17

direct appeal. *See, e.g., Hill v. Mitchell*, 400 F.3d 308, 314 (6th Cir. 2005) ("ineffective-assistance claims [raised in post-conviction] are not barred by res judicata under Ohio law when evidence outside the direct-appeal record is presented ...."); *White v. Mitchell*, 431 F.3d 517, 527 (6th Cir. 2005) ("ineffective assistance claim was not procedurally defaulted because of evidence submitted outside the record..."); *see also State v. Hooks*, 92 Ohio St. 3d 83, 83 (2001) (evidence cannot be added to the record on direct appeal). Petitioner's ineffective assistance claims in Grounds 3(E), 3(F), and 3(G) depend upon Marinelli's medical records (Ex. 4, Doc. 1-2, at 111-61), and testimony and statements by victim/witness Deborah Aziz (Exs. 7-10, Doc. 1-2, at 85-311) that were not part of Petitioner's trial record. Thus, pursuant to Ohio law, they could only have been raised in post-conviction proceedings.

"There is no constitutional right to an attorney in state post-conviction proceedings." *Coleman v. Thompson*, 501 U.S. 722 (1991). Therefore, ineffective assistance of counsel in such proceedings generally cannot serve as cause for procedural default. *Id.* As the Sixth Circuit most recently explained, however, the Supreme Court in *Martinez v. Ryan*, 566 U.S. 1 (2012), "created an exception to the general rule that ineffective assistance of postconviction counsel does not establish cause for a procedural default of an ineffective-assistance-of-trial-counsel claim." *Stojetz v. Ishee*, 892 F.3d 175, 201 (6th Cir. 2018). *Martinez* held that a procedural default may be excused by a claim of ineffective assistance of post-conviction counsel where:

> (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law *requires* that an "ineffective assistance of trial counsel [claim] ... be raised in an initial-review collateral proceeding."

18

*Trevino v. Thaler*, 569 U.S. 413, 423 (2013). In *Trevino*, "the Court modified the fourth element to apply to situations where state law makes it 'highly unlikely' that a defendant will have a meaningful opportunity' to raise ineffective-assistance claims on direct appeal." *Williams v. Mitchell*, 792 F.3d 606, 615 (6th Cir. 2015) (quoting *Trevino*, 569 U.S. at 429). The Sixth Circuit has "held that *Martinez* does not apply in Ohio and ha[s] questioned the applicability of *Trevino* in that state[.]" *Stojetz*, 892 F.2d at 202 (citing *Williams*, 792 F.3d at 615).

In *Hill v. Mitchell*, the Sixth Circuit explained that Ohio's dual track system for ineffective assistance of trial counsel claims (requiring those based on the record be raised on direct appeal, and those based outside the record be raised in post-conviction proceedings) "complicates matters with respect to *Trevino*." 842 F.3d 910, 937 (6th Cir. 2016) (citing *McGuire v. Warden, Chillicothe Corr. Inst.*, 738 F.3d 741, 751-52 (6th Cir. 2013)). The court explained further:

> In *McGuire*, we noted that "one could argue that the category requiring evidence *outside* the record must be brought on collateral review in order for review to be meaningful," suggesting the possibility that the *Martinez* exception could apply for that category of IATC claims. 738 F.3d at 751–52. But we also explained that, in the " 'ordinary' " Ohio case, " 'ineffective assistance of counsel at mitigation, just like ineffective assistance at trial, is an issue that can be brought on direct appeal.' " *Id.* at 752 (quoting *State v. Combs*, 100 Ohio App.3d 90, 652 N.E.2d 205, 212 (1994) (collecting Ohio cases)). "Arguably, then, the review of trial counsel ineffectiveness claims in Ohio is more 'meaningful' than Texas, because in Ohio there is 'ordinarily' the availability of direct review with a constitutionally required counsel, with the back-up of collateral attack where evidence outside the record is required." *Id.* We chose not to answer the question in *McGuire*, as our discussion merely "show[ed] that the application of *Trevino* to Ohio ineffective-assistance claims is neither obvious nor inevitable." *Id.* We have not answered it since. *See Williams v. Mitchell*, 792 F.3d 606, 615 (6th Cir. 2015).

*Hill*, 842 F.3d at 937-38 (emphasis in original).

The Sixth Circuit has repeatedly stopped short of answering the question of whether *Trevino* applies in Ohio by finding that even if it did apply in a particular case, the petitioner had not shown the underlying ineffective assistance of trial counsel claim to be sufficiently

"substantial" under *Martinez*. *See McGuire*, 738 F.3d at 752; *Landrum v. Anderson*, 813 F.3d 330, 336 (6th Cir. 2016); *Henness v. Bagley*, 766 F.3d 550, 447 (6th Cir. 2014).

Similarly here, even assuming *Martinez* and *Trevino* do apply in Ohio proceedings such as this one where an ineffective assistance of trial counsel claim is based on evidence outside the record (and thus, raised for the first time in a post-conviction proceeding), Petitioner has not shown a "substantial claim" of ineffective assistance of trial counsel.

A "substantial" claim of ineffective assistance of counsel under *Martinez*, is one that "has some merit". 566 U.S. at 14 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003); *see Miller-El*, 537 U.S. at 336 ("[R]easonable jurists could debate whether (or for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). "[T]his requirement applies as well to the prejudice portion of the ineffective assistance claim." *McGuire*, 738 F.3d at 752. Thus, for a claim to be "substantial" under *Martinez*, the claim must have "some merit" based on the controlling standard stated in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). That is, Petitioner must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense. *Id.* Counsel's performance is deficient if it falls below an objective standard of reasonableness. *Abby v. Howe,* 742 F.3d 221, 226 (6th Cir. 2014); *Williams v. Anderson,* 460 F.3d 789, 800 (6th Cir. 2006). "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington,* 562 U.S. at 104 (citing *Strickland,* 466 U.S. at 689). "The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *Id.* (quoting *Strickland,* 466 U.S. at 687). Such performance prejudices a defendant

in the guilt phase if "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Hinton v. Alabama,* 571 U.S. 263, 275 (2014) (quoting *Strickland,* 466 U.S. at 695). To determine whether a defendant was prejudiced, the court must consider all of the evidence presented to the jury. *See Strickland,* 466 U.S. at 695; *Jackson v. Bradshaw,* 681 F.3d 753, 760 (6th Cir. 2012). "Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

In Ground 3(E), Petitioner contends trial counsel was ineffective for failing to impeach Marinelli's testimony that he was shot four times in the stomach. He contends this is contradicted by Marinelli's medical records which show he suffered only a single gunshot wound to the stomach. Petitioner contends trial counsel had these records, and should have used them to impeach Marinelli's testimony. In Ground 3(F), Petitioner contends trial counsel was ineffective in failing to present evidence to challenge Marinelli's testimony that Petitioner said "You ain't dead yet motherfucker" before shooting Marinelli in the legs. Petitioner contends "Deborah Aziz did not hear this alleged inflammatory statement" despite "ma[king] it clear she could hear the shooter speak to Marinelli, and she could hear Marinelli speak to the shooter." (Doc. 9, at 51). Plaintiff's argument is based on Aziz's testimony from the trials of Petitioner's co-defendants and her statement to police. In Ground 3(G), Petitioner contends trial counsel was ineffective in failing to challenge Marinelli's description of the man in the white mask and resultant identification of Petitioner as that man. Again, this argument is based on Aziz's prior testimony describing the man in the mask, which conflicted with Marinelli's

The undersigned finds that even if *Martinez* and *Trevino* were held to apply in Ohio (a determination the Sixth Circuit has held "is neither obvious nor inevitable", *McGuire*, 738 F.3d at 752), Petitioner has failed to show a "substantial" claim of ineffective assistance of trial counsel.

A comparison of the evidence presented at trial as compared to the evidence Petitioner contends should have been presented, does not compel the conclusion that Petitioner's underlying claim for ineffective assistance of trial counsel is substantial. Whether post-conviction counsel was constitutionally ineffective necessarily depends on the strength of the underlying ineffective assistance of trial counsel claim.

First, the undersigned finds that Petitioner has not shown a substantial claim of ineffective assistance of trial counsel for failure to challenge Marinelli's testimony about the number of times he was shot. While Petitioner points to medical records to show Marinelli's injuries were not as severe as alleged and perhaps he was not "strong and fearless enough to take four gut shots before he fell to the floor" (Doc. 9, at 49), the undersigned finds there is not a substantial claim that Petitioner was prejudiced by counsel's failure to cross-examine on this issue. That is, there is not a substantial claim that had counsel cross-examined Marinelli on this point "the factfinder would have had a reasonable doubt respecting guilt." *Hinton,* 571 U.S. at 275 (quoting *Strickland,* 466 U.S. at 695).

Second, as to Marinelli's testimony that Petitioner said "You ain't dead yet motherfucker", Petitioner points to Aziz's testimony in prior proceedings that she was close enough to hear the shooter speak to Marinelli, but "never corroborates the statement Marinelli put in the shooter's mouth." (Doc. 9, at 51). But Aziz never testified in prior proceedings specifically that she did not hear such a statement, she simply never testified to it. And, in Petitioner's trial, she testified to what she heard between the gunman and Marinelli. (Tr. 3903, Doc. 7-18, at 42). Therefore, as with the claim above, the undersigned finds there is not a substantial claim that had counsel cross-examined Marinelli on this point, "the factfinder would have had a reasonable doubt respecting

guilt." *Hinton,* 571 U.S. at 275. (quoting *Strickland,* 466 U.S. at 695). That is, there is not a substantial claim of prejudice resulting from ineffective assistance of trial counsel.

Third, as to trial counsel's failure to challenge Marinelli's description using Aziz's prior testimony, as the Ohio Supreme Court explained in addressing Petitioner's ineffective assistance claim regarding eyewitness identification, there was corroborating testimony that Petitioner was the man in the white mask:

> {¶ 123} Notwithstanding, Appellant's accomplice, Dalton, testified that he saw Appellant:

> {¶ 124} " * * * put on a white mask resembling one seen in a 'slasher' movie. [And Appellant's other accomplice] Allen testified that [Appellant's] mask was the only 'store-bought' one worn by any of the robbers." *Herring,* 94 Ohio St.3d 246, 252-253, 762 N.E.2d 940.

*Herring II*, 2004 WL 2334325, *15. Further, in closing argument, defense counsel focused on the fact that the mask would have hidden any identifying facial features. (Tr. 4436, Doc. 7-10, at 173 ("Because the two things that coincide with Debbie [Aziz] and Mr. Marinelli are, there was a white mask, a Jason mask. And that Jason mask would have hidden the things that everyone said you could see."). Thus, the failure of defense counsel to elicit Aziz's contradictory description of the facial features of the man in the white mask does not present a substantial claim of ineffective assistance of trial counsel. That is, such evidence would not have provided a factfinder with a reasonable doubt as to Petitioner's guilt. *See Hinton*, 571 U.S. at 275.

### Ground 3(A)(4)

In Ground 3(A)(4), Petitioner asserts ineffective assistance of trial counsel for failure to object to the trial court's use of Ohio's statutory definition of reasonable doubt. (Doc. 1-1, at 18). Respondent contends Ground 3(A)(4) is defaulted because Petitioner failed to timely raise it to the state courts. (Doc. 6, at 16). Petitioner responds that this claim was properly raised and is therefore

preserved. (Doc. 9, at 9). Petitioner is correct. The record reflects Petitioner raised an ineffective assistance of counsel claim on this same factual basis to the Ohio Supreme Court. *See* Ex. 9, Doc. 6-1, at 181-82 ("Defense counsel failed to protect Appellant Herring's rights by failing to object to . . . the trial court's use of Ohio's statutory definition of reasonable doubt."). And the court rejected the claim on the merits. *See Herring I*, 94 Ohio St. 3d at 261-62 ("Herring contends that his counsel should have objected to instruction on purpose and reasonable doubt. However, these objections were unsupported by existing law. *See State v. Phillips*, *supra*, 74 Ohio St. 3d at 100 . . . *State v. Van Grundy* (1992), 64 Ohio St. 3d 230 . . . ."). Thus, the undersigned recommends the court find this ground is not procedurally defaulted, and preserved for habeas merits review.

**Ground 4(B)**

Respondent asserts Ground 4(B) is procedurally defaulted due to Petitioner's failure to raise it before the Ohio courts. Petitioner concedes the default. (Doc. 9, at 16). Ground 4(B) asserts prosecutorial misconduct in failing to correct testimony from Marinelli. The parties are correct this claim is defaulted because Petitioner did not contemporaneously object. *See Howard*, 405 F.3d at 477. Thus, it cannot be considered unless Petitioner can show cause and prejudice to excuse his default.

> *Cause & Prejudice*

Petitioner asserts he "can establish 'cause' for his prosecutorial misconduct claim on the basis that the prosecution failed to correct perjured and exaggerated testimony, and that Herring reasonably relied on the prosecutor's duty to do so." (Doc. 9, at 16). But this is circular logic. The prosecutor's failure to correct cannot serve as cause to excuse trial counsel's failure to object to the prosecutor's failure to correct. As such, the undersigned recommends the court find Ground 4(B) defaulted.

24

**Ground 6**

Respondent asserts, and Petitioner concedes (Doc. 9, at 17), that Ground 6 is defaulted due to the lack of a contemporaneous objection at trial. In Ground 6, Petitioner challenges the trial court's jury instruction on reasonable doubt. Specifically, Petitioner argues that Ohio's statutory definition of reasonable doubt "does not require the quantum of proof mandated by the U.S. Constitution." (Doc. 9, at 77). Under Ohio law, challenges to jury instructions must be made before the jury retires. *See* Ohio Crim. R. 30. As Petitioner concedes, he did not object to this instruction. When Petitioner attempted to raise this claim on direct appeal, the appellate court enforced Ohio's contemporaneous objection rule. *Herring*, 94 Ohio St. 3d at 266 ("However, at trial he did not object to any of the instructions challenged here. He thereby waived these issues. See *State v. Long* (1978), 53 Ohio St. 2d 91 . . . paragraph one of the syllabus.").[3] Ohio's contemporaneous objection rule is an independent and adequate state procedural rule. *See Howard v. Bouchard*, 405 F.3d 459, 477 (6th Cir. 2005); *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001). Thus, Ground 6 can only be considered if Petitioner can show cause and prejudice to overcome the default.

*Cause & Prejudice*

Petitioner asserts ineffective assistance of trial counsel can serve as his cause and prejudice to overcome this default. A fairly presented and valid claim of ineffective assistance of counsel claim may serve as cause to excuse procedural default. *See Goldberg v. Money*, 692 F.3d 534, 537 (6th Cir. 2012) (citing *Edwards v. Carpenter*, 529 U.S. 446, 456 (2000)). As discussed above regarding Ground 3(A)(4), Petitioner did raise and preserve a claim of ineffective assistance of trial counsel on these grounds. However, the undersigned is not persuaded the Ohio Supreme

---

3. Although the Ohio Supreme Court also noted it found "no plain error with respect to any of these [jury instruction] claims", 94 Ohio St. 3d at 266, "plain error review does not constitute a waiver of state procedural default rules", *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000).

Court's decision rejecting Petitioner's challenge to the jury instruction and related ineffective assistance claim is an unreasonable application of federal law. The Sixth Circuit has repeatedly approved giving jury instructions based on Ohio's statutory definition of reasonable doubt. *See, e.g., White v. Mitchell*, 431 F.3d 517, 534 (6th Cir. 2005) ("We have specifically ruled that Ohio's articulation of the reasonable doubt standard does not offend due process."); *see also Franklin v. Bradshaw*, 695 F.3d 439, 455-46 (6th Cir. 2012); *Buell v. Mitchell*, 274 F.3d 337, 366 (6th Cir. 2001); *Scott v. Mitchell*, 209 F.3d 854, 884 (6th Cir. 2000); *Byrd v. Collins*, 209 F.3d 486, 527 (6th Cir. 2000); *Thomas v. Arn*, 704 F.2d 865, 870 (6th Cir. 1982). Thus, Petitioner cannot show prejudice to overcome this claim, because he cannot show the outcome would have been different had his counsel objected to the jury instruction. The Ohio Supreme Court's determination on the issue was neither contrary to, nor an unreasonable application of clearly established Supreme Court precedent.

Merits

### Ground 1: Jury Instructions

In Ground 1, Petitioner asserts the trial court gave an erroneous jury instruction regarding the "intent to kill" element. He contends the trial court gave a specific intent to kill instruction on the principal offender charge, but not on the complicity charges. He asserts this violated his Constitutional right to a fair trial. Petitioner presented this argument on direct appeal. (Ex. 9, Doc. 6-1).

A defendant has the right to have every element of an offense proven beyond a reasonable doubt. *See In re Winship*, 397 U.S. 358, 364 (1970).The Supreme Court has said that "[a] trial judge's duty is to give instructions sufficient to explain the law, an obligation that exists independently of any question from the jurors or any other indication of perplexity on their part."

*Kelly v. South Carolina*, 534 U.S. 246, 256 (2002). But "not every ambiguity, inconsistency, or

deficiency in a jury instruction rises to the level of a due process violation." *Middleton v. McNeil*,

541 U.S. 433, 437 (2004). The "only question" on habeas review of jury instructions "is 'whether

the ailing instruction infected the entire trial to the extent that the resulting conviction violates due

process.'" *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Cupp v. Naughten*, 414 U.S. 141,

147 (1973). "To warrant habeas relief, 'jury instructions must not only have been erroneous, but

also, taken as a whole, so infirm that they rendered the entire trial fundamentally unfair.' " *Buell*

*v. Mitchell*, 274 F.3d 337, 355 (6th Cir. 2001) (quoting *Scott v. Mitchell*, 209 F.3d 854, 882 (6th

Cir. 2000)). A due process violation occurs if there is a "'reasonable likelihood that the jury has

applied the challenged instruction in a way' that violates the Constitution." *Estelle*, 502 U.S. at 72

(quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)).

The Ohio Supreme Court addressed this claim on direct appeal:

In his first and second propositions of law, Herring contends that faulty instructions
on the issue of specific intent to kill invalidate his aggravated-murder convictions.
Purpose (*i.e.*, intent) to kill is an essential element of aggravated murder. R.C.
2903.01. See, *e.g.*, *State v. Garner* (1995), 74 Ohio St.3d 49, 59, 656 N.E.2d 623,
634. Moreover, "[t]o support a conviction for complicity by aiding and abetting
pursuant to R.C. 2923.03(A)(2), the evidence must show * * * that the defendant
shared the criminal intent of the principal." *State v. Johnson* (2001), 93 Ohio St.3d
240, 754 N.E.2d 796, syllabus.

With respect to Count One (aggravated murder of Jimmie Lee Jones), the trial court
gave a standard instruction on specific intent. However, the court then instructed
that if the state failed to prove that Herring was the principal offender on Count
One, the jury could consider whether he was guilty of complicity. The court
instructed: "You may not convict Willie S. Herring of complicity to commit
aggravated murder unless you find beyond a reasonable doubt that he specifically
intended to aid and abet another in causing the death of Jimmie Lee Jones." On
Counts Two (aggravated murder of Herman Naze) and Three (aggravated murder
of Dennis Kotheimer), the court gave the same instruction, precluding the jury from
convicting Herring of complicity in aggravated murder unless it found that he
"specifically intended to aid and abet another in causing the death of" each victim.
The court also defined the terms "aid" and "abet" as follows: "Aid means to help,

27

assist or strengthen. Abet means to encourage, counsel, incite or assist." See 4 Ohio Jury Instructions (2000) 573, Sections 523.03(8) and 523.03(9).

These instructions, Herring contends, did not sufficiently inform the jury that it could not find him guilty on Counts One, Two, or Three without finding that he specifically intended to kill.

Where an instruction is claimed to be "ambiguous and therefore subject to an erroneous interpretation," the court must inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction" incorrectly. See *Boyde v. California* (1990), 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316, 329.

Herring's claim assumes that the jury could have found that he "specifically intended to aid and abet another in causing the death" of another without finding that he specifically intended to cause the death of another. We disagree. It is hard to see how a person could, in the words of the instruction, *intend* to "help, assist, or strengthen" or "encourage, counsel, incite, or assist" another person in causing death, without also intending that the victim die. It is equally hard to see any reasonable likelihood that the jury would understand the instruction as allowing the conviction of a defendant who did *not* intend that the victim die. Thus, the instructions the trial court gave are functionally equivalent to an instruction requiring specific intent to cause death. Herring's first proposition of law is overruled.

In his second proposition of law, Herring contends that the jury never actually found that he intended to kill Jones, Naze, and Kotheimer. Ordinarily, of course, the guilty verdicts on the aggravated-murder counts would show that the jury did so find. However, Herring contends that due to the allegedly faulty instruction on intent, these verdicts do not reflect an actual jury finding of intent. Rejecting the premise that the instructions were flawed, we reject this claim as well.

Herring's second proposition of law further contends that the trial judge made an affirmative finding of a lack of intent to kill and that we should accept that finding and reverse his aggravated-murder convictions. But this case was tried to a jury, and it is the jury's verdict that binds us. The jury found that Herring did intend the deaths of Jones, Naze, and Kotheimer.

Moreover, the trial judge did not, in fact, find that Herring lacked intent to kill. Herring quotes passages from the sentencing opinion stating that "the degree of the defendant's participation in the offense which led to the deaths of Herman Naze, Sr., Dennis Kotheimer and Jimmie Lee Jones could not be determined and was therefore unclear." But the sentencing opinion did not say that Herring's *state of mind* was unclear or indeterminate; it said that the "degree of his *participation* in the offense" was.

> The opinion goes on to state that "the defendant was the offender (shooter) in the attempt to kill Marinelli and Aziz." In other words, the judge was distinguishing between the shootings in which the degree of Herring's participation was unclear and the shootings in which it was clear that Herring was the principal offender. He was not making any sort of finding as to lack of *mens rea*.
>
> Herring's second proposition of law lacks merit and is overruled.

*Herring I*, 94 Ohio St. 3d at 249-51 (emphasis in original).

The Ohio Supreme Court thus found: 1) the instructions were not flawed, and, 2) to the extent they were ambiguous, there was not a reasonable likelihood the jury applied them incorrectly. *See id*. Petitioner argues this is an unreasonable application of the law because the Ohio Supreme Court did not examine the instructions in the context of the instructions as a whole, as in the context of the trial record as a whole. Petitioner cites arguments made to the trial court and its misstatement of the law, requiring only specific intent to aid and abet, and not specific intent to kill. (Doc. 9, at 26) (citing Tr. 4458, Doc. 7-20, at 195). Even if the trial court misstated and misunderstood the law, the Ohio Supreme Court's determination there was not a reasonable probability the jury applied the instructions incorrectly (that is, convicting Petitioner of complicity without finding specific intent to kill), is not unreasonable. As the court explained: "It is hard to see how a person could, in the words of the instruction, *intend* to "help, assist, or strengthen" or "encourage, counsel, incite, or assist" another person in causing death, without also intending that the victim die. It is equally hard to see any reasonable likelihood that the jury would understand the instruction as allowing the conviction of a defendant who did *not* intend that the victim die." *Herring I*, 94 Ohio St. 3d at 250 (emphasis in original). Petitioner further argues the fact that Petitioner "was found not guilty of the principal offender charge, the only charge for which the jury was given a specific intent to kill instruction" demonstrates that there is a likelihood the jury applied the instruction incorrectly. (Doc. 9, at 27). However, as the Ohio Supreme Court explained

29

factually, "Nobody saw who shot Jimmie Lee Jones [the subject of Count 1]". *Herring I*, 94 Ohio St. 3d at 248. Thus, it was not necessarily illogical for the jury to find Petitioner guilty of complicity on Count 1, but not of the principal offender charge. The undersigned finds the state court decision on this point was neither contrary to nor an unreasonable application of federal law. As such, the undersigned recommends Ground 1 be denied.

### Ground 2: Juror Misconduct

In Ground 2, Petitioner asserts he was denied his Sixth and Fourteenth Amendment rights to a fair trial and due process when jurors considered inadmissible and prejudicial evidence to convict him. Petitioner presented this argument in post-conviction proceedings. (Ex. 18, Doc. 6-3, at 66-68; Ex. 22, Doc. 6-4, at 48-51; Ex. 27, Doc. 6-5, at 23-24). He there presented, and presents to this court, a post-trial affidavit from an investigator who asserts two jurors told him "the testimony of Ronald Marinelli identifying Willie Herring as the man who shot him was the most important evidence presented at [Petitioner's] trial." (Ex. 18, Doc. 6-3, at 325). One juror also purportedly stated "she believed that if someone has been shot, that person would always be able to identify the person who shot him or her, even if the shooter was wearing a mask." *Id.*

The Sixth and Fourteenth Amendments to the Constitution guarantee criminal defendants the right to an impartial jury. *Morgan v. Illinois*, 504 U.S. 719, 726 (1992). The Supreme Court has explained that the "near-universal and firmly established common-law rule in the United States" has been to prohibit the admission of juror testimony to impeach a verdict. *Tanner v. United States*, 483 U.S. 107, 117 (1987).[4] Exceptions to this common-law rule were recognized in situations where an "extraneous influence" affected the jury. *Mattox v. United States*, 146 U.S.

---

4. This is also known as the "aliunde rule", *see, e.g., Gross v. Warden, Lebanon Corr. Inst.*, 426 F. App'x 349, 357 (6th Cir. 2011) and was later codified as Federal Evidence Rule 606(b), *see United States v. Gonzales*, 227 F.3d 520, 524 (6th Cir. 2000).

140, 149 (1892). The Supreme Court has found such an extraneous influence where a bailiff commented on a defendant, *Parker v. Gladden*, 385 U.S. 363, 365 (1996), where a juror was offered a bribe, *Remmer v. United States*, 347 U.S. 227, 228 (1954), and where a juror in a criminal trial had submitted an application for employment to the District Attorney's office, *Smith v. Phillips*, 455 U.S. 209 (1982). By contrast, "[c]ourts wisely have treated allegations of a juror's inability to hear or comprehend at trial as an internal matter", and refused to allow juror testimony on the issue. *Tanner*, 483 U.S. at 118; *see also Davis v. United States*, 47 F.2d 1071, 1071-72 (5th Cir. 1931) (testimony that jurors did not hear instruction that jury was not permitted to consider defendant's failure to testify as evidence of guilt). Courts have refused to permit juror testimony regarding misinterpretation or misapplication of jury instructions. *See United States v. Tines*, 70 F.3d 891, 898 (6th Cir. 1995) ("A jury's interpretation and application of the court's instructions is a part of the deliberative process and was correctly excluded under Rule 606(b)."); *see also United States v. Rodriguez*, 116 F.3d 1225, 1227 (1997) (upholding refusal to consider juror testimony that jurors relied upon defendant's silence in contravention of trial instructions).

On appeal of Petitioner's post-conviction petition, the Ohio appellate court affirmed the trial court's denial of an evidentiary hearing and discovery on Petitioner's juror misconduct claim:

> {¶ 145} Appellant's final argument under his first assignment of error asserts that the jury may have failed to follow the court's instructions regarding a sustained objection. Specifically, Appellant points to the use of a photograph of Appellant that was used to assist Marinelli's identification of Appellant's distinct hairstyle at the time of the offense. (Trial Tr., Vol. XIX of XXIII, pp. 4131, 4154.) After describing the features of the man in the mask, and upon being presented a photograph of Appellant with a different hairstyle, Marinelli blurted out: "I don't have to look at it more than a second. I saw it through my eyes and was shot five times by this guy, and it is him." (Trial Tr., Vol. XIX of XXIII, pp. 4131.)

> {¶ 146} Appellant's trial counsel's subsequent request for a mistrial was overruled, but the court granted the request for a precautionary instruction. (Trial Tr., Vol. XIX of XXIII, p. 4169.)

31

{¶ 147} In support of his claims, Appellant provides the affidavit of Matt Franklin ("Franklin"), a public defender criminal investigator, who avers that two of Appellant's jurors stated that Marinelli's identification of Appellant, "as the man who shot him was the most important evidence presented at * * * trial." (9/17/99 Postconviction Petition, Appendix, Exh. 37, ¶ 4.) Appellant asserts that he needs to obtain further discovery and he requests a hearing to pursue this ground for postconviction relief.

{¶ 148} The Ohio Supreme Court addressed this very issue in Appellant's direct appeal, and it concluded:

{¶ 149} " * * * jurors are generally presumed to follow the trial court's instructions, including instructions to disregard testimony. * * *

{¶ 150} "Herring argues that eyewitness identification is unusually difficult to disregard. That may be, but '[j]uries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.' * * * Testimony like this-positively identifying a criminal who was wearing a mask-is not necessarily persuasive, and its impact on the jury is highly uncertain. Moreover, the state did not elicit Marinelli's identification * * *. Nor did the prosecutors refer to that identification during trial or in argument.

{¶ 151} " * * * Marinelli's remark did not render a fair trial impossible. * * * " *Herring,* 94 Ohio St.3d 246, 254-255, 762 N.E.2d 940, cert. denied *Herring v. Ohio* (2002), 537 U.S. 917, 123 S.Ct. 301, 154 L.Ed.2d 202.

{¶ 152} Further, a petitioner has no statutory right to discovery in a postconviction proceeding. *State v. Doan,* 12th Dist. No. CA2001-09-030, 2002-Ohio-3351, at ¶ 56. In addition, it has been held that a postconviction defendant is not entitled to unlimited discovery. Instead, a postconviction defendant, "who has availed himself of a public records request has received all the discovery he is entitled to receive." *State v. Apanovitch* (1995), 107 Ohio App.3d 82, 97, 667 N.E.2d 1041.

{¶ 153} Notwithstanding, Evid.R. 606, competency of juror as witness, provides in part:

{¶ 154} "Upon an inquiry into the validity of a verdict * * *, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith. * * * His affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying will not be received for these purposes."

{¶ 155} Based on Evid.R. 606(B), both the juror's statements and hearsay testimony concerning the juror's statements provided in Franklin's affidavit are

inadmissible unless there exists distinct and independent evidence, other than a juror's testimony, impeaching the jury's verdict. *State v. Gleason* (1996), 110 Ohio App.3d 240, 673 N.E.2d 985, cert. denied 77 Ohio St.3d 1416, 670 N.E.2d 1004. Since there is no other evidence impeaching the verdict in this case, Franklin's affidavit cannot be considered.

{¶ 156} Based on the foregoing, the trial court did not err in denying Appellant discovery and an evidentiary hearing on this issue. This sub-issue is overruled. *Herring*, 94 Ohio St.3d 246, 254-255, 762 N.E.2d 940, cert. denied *Herring v. Ohio* (2002), 537 U.S. 917, 123 S.Ct. 301, 154 L.Ed.2d 202.

*Herring II*, 2004 WL 2334325, at *17-18.

Petitioner relies on the Supreme Court's recent decision in *Pena-Rodriguez v. Colorado*, — U.S. —,137 S. Ct. 855 (2017). In *Pena-Rodriguez*, the Colorado Supreme Court relied on the State's version of Evidence Rule 606(b) to prohibit testimony about ethnically biased comments made during deliberations. *Colorado v. Pena Rodriquez*, 350 P.3d 287 (Colo. 2015). The United States Supreme Court overturned, holding that "where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee." *Id.* at 869. Petitioner relies on *Pena-Rodriguez* for the proposition that "the 'aliunde rule' does not bar any and all consideration of juror affidavits/testimony, depending upon the facts of the case." (Doc. 9, at 29). Respondent reads the case more narrowly as standing for the proposition that "further inquiry is necessary when a juror clearly indicates that he relied on an overt racial bias in his verdict." (Doc. 6, at 34). The Fifth Circuit has described *Pena-Rodriguez* as "open[ing], narrowly we think, this door thought closed". *Young v. Davis*, 860 F.3d 318, 333 (5th Cir. 2017). The *Young* court explained:

The Court's emphasis on our long struggle against racial prejudice, and the "constitutional[ ] and institutional concerns" attending that history, evince its constrained relaxing of a traditionally inviolate rule. Prohibition of racial

33

> discrimination lies at the core of the Fourteenth Amendment. And in the erratic but relentless *334 march toward a color-blind justice, its role in criminal proceedings has been salient. We decline the invitation to extend further the reach of Pena-Rodriguez, one antithetical to the privacy of jury deliberations—a principle whose loss would be attended by such high costs as to explain its veneration.

*Id.* at 333-34. Indeed, in *Pena-Rodriguez*, the Supreme Court noted that "[r]acial bias, unlike the behavior in *McDonald*, *Tanner*, or *Warger*, implicates unique historical, constitutional, and institutional concerns, and if left unaddressed, would risk systemic injury to the administration of justice." 137 S.Ct. at 859. The undersigned therefore agrees with Respondent that *Pena-Rodriguez* carved out a narrow exception to the traditional rule barring juror testimony about deliberation considerations based upon specific concerns related to racial bias.

By contrast, Petitioner's claim here does not relate to racial bias, but rather, to two jurors' alleged failure to follow the trial court's instruction to disregard a photograph. The failure to follow an instruction is not an "extraneous influence", but rather something internal to the trial. In an Eighth Circuit case, the court held that jurors could not testify as to their consideration of the defendant's failure to testify in contravention of the trial court's instruction. *United States v. Rodriguez*, 116 F.3d 1225, 1227 (1997). The *Rodriguez* court explained:

> That Rodriguez did not testify is not a fact the jurors learned through outside contact, communication, or publicity. It did not enter the jury room through an external, prohibited route. It was part of the trial, and was part of the information each juror collected. It should not have been discussed by the jury, and indeed was the subject of a jury instruction to that effect. But it was not "extraneous information," and therefore does not fall within the exception outlined in Rule 606(b).[2] Accordingly, members of the jury are prohibited by Rule 606(b) from testifying about their deliberations or impeaching their verdict.

*Id.* (footnote omitted). Similarly here, the photograph was not "extraneous information" from outside the trial, but was internal to the trial procedure itself. Petitioner attempts to analogize his case to *Mattox*, where the Supreme Court permitted jurors to testify that they had heard and read information from a newspaper article. (Doc. 9, at 31). Petitioner argues that *Mattox* involved a jury

34

who had been instructed not to read anything about the case, but did. This is true, but there, the newspaper was the extraneous information, and was not internal to the trial.

Petitioner points to no clearly established federal law from the Supreme Court holding that barring testimony a juror violated the trial court's instructions violates the Constitution and falls within the exceptions to the general rule prohibiting juror testimony. And, the Sixth Circuit has explained that where an affidavit does not allege that a jury was influenced by "extraneous information, testimony is properly excluded, and "there is no 'constitutional impediment to enforcing' Ohio's *aliunde* rule[.]" *Hoffner v. Bradshaw*, 622 F.3d 487, 501 (6th Cir. 2010) (quoting *Brown v. Bradshaw*, 531 F.3d 433, 438 (6th Cir. 2008)). The Ohio Supreme Court's determination excluding the juror affidavits is neither contrary to, nor an unreasonable application of, federal law. As such, the undersigned recommends the court deny relief on Ground 2.

### Ground 3: Ineffective Assistance of Trial Counsel

In Ground 3, Petitioner raises claims of ineffective assistance of trial counsel. He raised Grounds 3(A) and 3(B) on direct appeal, *see* Ex. 9, Doc. 6-1, at 186-89, and Grounds 3(C) and 3(D) in his post-conviction proceedings, *see* Ex. 18, Doc. 6-3, at 61-65. Thus, they are preserved for federal habeas review.

As discussed above, to prevail on a claim of ineffective assistance of counsel, Petitioner must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 687. Counsel's performance is deficient if it falls below an objective standard of reasonableness. *Abby*, 742 F.3d at 226. Such performance prejudices a defendant in the guilt phase if "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Hinton*, 571 U.S. at 275 (quoting *Strickland,* 466 U.S. at 695). To determine whether a defendant was prejudiced, the court

35

must consider all of the evidence presented to the jury. *See Strickland,* 466 U.S. at 695; *Jackson*, 681 F.3d at 760. Review of a *Strickland* claim is doubly deferential in a habeas proceeding. *Yarborough* 540 U.S. at 6; *see also Harrington*, 562 U.S. at 105. This double deference arises because the *Strickland* standard is a general standard, giving a state court even more latitude to reasonably determine that a defendant has not satisfied the standard. *Knowles*, 556 U.S. at 123. "A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Harrington*, 562 U.S. at 101. Accordingly, the pivotal question in any habeas action presenting an ineffective assistance claim is "whether the state court's application of the *Strickland* standard was unreasonable." *Id.*

Direct Appeal Claims

On direct appeal, the Ohio Supreme Court addressed the claims Petitioner now presents as Grounds 3(A) and 3(B).

Herring contends that his counsel should have objected to instructions on purpose and reasonable doubt. However, these objections were unsupported by existing law. See *State v. Phillips, supra,* 74 Ohio St.3d at 100, 656 N.E.2d at 668; *State v. Van Gundy* (1992), 64 Ohio St.3d 230, 594 N.E.2d 604. Declining to present rejected legal theories is not ineffective assistance. See *State v. McNeill* (1998), 83 Ohio St.3d 438, 448–449, 700 N.E.2d 596, 607.

Herring further contends that counsel should have objected to the instruction on foreseeability. However, Herring was not prejudiced by his counsel's failure to object, since the instructions as a whole required the jury to find purpose to kill in order to convict. (See discussion of Herring's second proposition of law above.)

Herring was also not prejudiced by counsel's failure to insist on his presence when the judge gave nonsubstantive responses to jury questions because there is no reasonable likelihood that the result of the trial would have been different had Herring been present.

Herring contends that counsel should have objected to more of the prosecutorial misconduct alleged in his eleventh proposition of law, but there were no grounds to object.

> Herring contends that counsel should not have called Officer Mikus to testify about
> finding the murder weapon in Obie Crockett's possession. He contends that this
> merely helped the state in "tying up loose ends" by corroborating the testimony of
> Allen and Dalton that Herring got guns at a house on Laclede Avenue. However,
> the record does not demonstrate that counsel committed an unprofessional error by
> calling Mikus to the stand. Evidence that a murder weapon was found in the
> possession of someone other than the defendant could reasonably be considered
> favorable to the defense. Moreover, using that evidence gave counsel an opening
> to attack the police investigation as inadequate because of failure to investigate
> Crockett's possible role in the crime. Calling Mikus to testify about Crockett's
> possession of the murder weapon appears to have been a reasonable tactical choice
> that did not fall below an objective standard of reasonable representation.

*Herring I*, 94 Ohio St. 3d at 261-62.

Under the double deference applicable to an ineffective assistance claim on habeas review, the undersigned finds the state court's determination of this issue neither contrary to nor an unreasonable application of federal law. First, as set forth in greater detail above in Ground 1, the Ohio Supreme Court's determination regarding the jury instructions was neither contrary to nor an unreasonable application of federal law.

Second, the state court's determination that Petitioner could not show prejudice resulting from his absence when the trial court answered the jury's questions is not unreasonable. Although Petitioner argues "Herring's presence was required when each and every one of these questions was answered", he cites no law in support. (Doc. 9, at 38-39). *See Simmons v. Sheets*, 2011 WL 1043909, at *30 (S.D. Ohio) ("[T]he United States Supreme Court has not determined whether the answering of jury questions constitute a critical stage of the proceedings at which a criminal defendant is constitutionally entitled to be present."), *report and recommendation adopted by* 2011 WL 1002734. Moreover, nothing about the questions asked suggests Petitioner's presence would have changed the answers provided by the trial court, or a substantial likelihood that the result of

the trial would have been different due to his presence.[5] Thus, it was not unreasonable for the state

court to determine counsel's failure to insist on Petitioner's presence did not rise to the level of

ineffective assistance of counsel.

Third, the Ohio Supreme Court's determination on Petitioner's prosecutorial misconduct

claim was not an unreasonable application of federal law (as discussed below). Therefore, the state

court's determination that trial counsel's failure to object was not ineffective assistance was also

not an unreasonable application of federal law. *See Conley v. Warden, Chillicothe Corr. Inst.*, 505

F. App'x 501, 508 (6th Cir. 2012) (rejecting ineffective assistance claim based on the fact that trial

counsel is under no obligation to raise meritless objections).

Finally, the state court determination that calling Officer Mikus to testify was "a reasonable

tactical choice" was not unreasonable. Specifically, the Ohio Supreme Court's determination that

"[e]vidence that a murder weapon was found in the possession of someone other than the defendant

could reasonably be considered favorable to the defense" and "using that evidence gave counsel

an opening to attack the police investigation as inadequate because of failure to investigate

Crockett's possible role in the crime," *Herring I*, 94 Ohio St. 3d at 262, is a reasonable

---

5. The jury asked: 1) "We need to have testimony given in the trial by Dalton, Allen and Marinelli." and 2) "We would like to know who had the black hood on. It was mentioned in closing statements", to which the judge responded that the jury must rely on its collective memory. (Tr. 4548, Doc. 7-21, at 84). The jury also asked to see a mask that defense counsel had attempted to admit into evidence, but which was not admitted ("Even though we know the mask is only similar, we would like to see it."), to which the trial court responded: "that mask was not admitted into evidence, so you are not permitted to see it." *Id.* The jury later asked for a copy of the police report, which the trial court informed them was not admitted into evidence, and therefore not available. (Tr. 4555, Doc. 7-21, at 91). A juror later submitted a question stating: "Is there any reason why we have to tolerate screaming and pounding on the table without our opinion being heard". (Tr. 4560, Doc. 7-21, at 96). After conferring with counsel, the trial court instructed the jury to take a break and resume deliberations the following morning. *Id.* The jury also asked for the "law regarding jury deliberation" and whether they could sign the counts out of numerical order. (Tr. 4582, Doc. 7-21, at 118). The trial court referred the jury to the jury instructions. (Tr. 4583-84, Doc. 7-21, at 119-20).

interpretation. Again, review of ineffective assistance of counsel claims is highly deferential, considering only "whether the state court's application of the *Strickland* standard was unreasonable." *Harrington*, 562 U.S. at 101. Petitioner argues that "if trial counsel's strategy was an attempt to show that someone other than Herring had possession of that gun, they could have delved deeper into who Obie Crocket was, why he would have had that gun, and how he could have been connected to the crime" (Doc. 9, at 41). But as *Strickland* advised, "[j]udicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S. at 669. And, trial counsel did argue in closing that the state should have further pursued Crockett as a suspect. *See* Tr. 4430, 4441-42, Doc. 7-20, at 167, 178-79). The undersigned therefore recommends the court deny Grounds 3(A) and 3(B) of the Petition.

<u>Post-Conviction Claims</u>

In post-conviction proceedings, the Ohio appellate court addressed the claims Petitioner now presents as Grounds 3(C) and 3(D):

> {¶ 120} Appellant next asserts that he was denied the effective assistance of counsel as a result of his trial counsel's failure to secure and to present an eyewitness identification expert during the guilt phase of his trial.

> {¶ 121} Appellant provides the affidavit of Harvey Shulman, Ph.D. ("Shulman") in support of this sub-issue. (9/17/99 Postconviction Petition, Appendix, Exh. 34.) The eyewitnesses identifying Appellant at trial were two of the shooting victims of the crimes, Aziz and Marinelli. *Herring,* 94 Ohio St.3d 246, 252, 762 N.E.2d 940. Both witnesses are Caucasian whereas Appellant is African American. (9/17/99 Postconviction Petition, Appendix, Exh. 34, ¶ 25.)

> {¶ 122} In his affidavit, Shulman states that a Caucasian witness identifying an African American is the least accurate of all eyewitness identifications.

> {¶ 123} Notwithstanding, Appellant's accomplice, Dalton, testified that he saw Appellant:

{¶ 124} " * * * put on a white mask resembling one seen in a 'slasher' movie. [And Appellant's other accomplice] Allen testified that [Appellant's] mask was the only 'store-bought' one worn by any of the robbers." *Herring,* 94 Ohio St.3d 246, 252-253, 762 N.E.2d 940.

{¶ 125} Based on the record, Appellant's identification as the shooter was corroborated. It is not conceivable that this expert testimony would have affected the outcome of the trial. As such, Appellant's assertion that his trial counsel was ineffective as a result of their failure to secure an eyewitness expert to testify is unfounded.

{¶ 126} Appellant also alleges that he was denied the effective assistance of counsel as a result of his trial counsel's failure to impeach the eyewitnesses' testimony. Appellant claims that Marinelli's identification of Appellant as the man in the white mask was false. This argument is based on what Appellant's sister Nicole allegedly overheard prior to Marinelli's trial testimony.

{¶ 127} Nicole heard Marinelli state:

{¶ 128} " * * * he [Marinelli] didn't care who did it [the crime], but that someone was going to get the death penalty for it. [And she assumed that since] Willie was the last one to go to trial, * * * [Marinelli] must have been talking about Willie." (9/17/99 Postconviction Petition, Appendix, Exh.10.)

{¶ 129} However, Appellant's trial counsel may have chosen not to cross-examine Marinelli on this issue to avoid strengthening his testimony since he would have likely denied falsifying his testimony. In addition, Appellant's trial counsel may have chosen not to address this to avoid the appearance of attacking the victim, which also may have resulted in supporting Marinelli's testimony via sympathy and resulted in dislike for Appellant's counsel. Finally, counsel may not have believed Nicole.

{¶ 130} Based on the foregoing, Appellant's trial counsel's decision not to address this issue at trial was a purely tactical decision and does not constitute the ineffective assistance of counsel contrary to the Sixth Amendment. As such, it is overruled.

*Herring II*, 2004 WL 2334325, at *15.

Again, under the double deference applicable to an ineffective assistance claim on habeas review, the undersigned finds the state court's determination of this issue neither contrary to nor an unreasonable application of federal law. The state court provided reasonable explanations for

counsel's actions, and that Petitioner did not suffer prejudice as a result of counsel's actions. First, Petitioner contends counsel should have retained an eyewitness identification expert to undermine Marinelli's identification testimony. But, as the state court reasonably determined, this testimony was corroborated by Dalton's testimony that Petitioner was the only individual wearing a store bought white mask. *Herring II*, 2004 WL 2334325, at *15. Thus, it was not unreasonable for the state court to determine that "[i]t is not conceivable that this expert testimony would have affected the outcome of the trial." *Id.* That is, Petitioner could not show prejudice.

Second, Petitioner contends counsel was ineffective for failing to impeach Marinelli's testimony identifying Petitioner as the man in the white mask. Petitioner based this on statements his sister overheard Marinelli make. Again, however, the state court provided reasonable explanations for how this could have been a reasonable tactical decision: 1) "to avoid strengthening his testimony since he would likely have denied falsifying his testimony"; 2) "to avoid the appearance of attacking the victim, which also may have resulted in supporting Marinelli's testimony via sympathy and resulted in dislike for Appellant's counsel; and 3) "counsel may not have believed [Petitioner's sister]". *Herring II*, 2004 WL 2334325, at *15. As *Strickland* advised, "[j]udicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S. at 669. The Ohio court's decision that Petitioner's argument lacked merit is entitled to significant deference. And such tactical decisions about cross-examination are precisely what the deference to trial counsel is aimed to protect. The decision not to cross-examine on this basis was not outside the realm of reasonable professional judgments.

41

Therefore, the undersigned recommends the court deny Grounds 3(A), 3(B), 3(C), and 3(D) as the state court decision on these ineffective assistance of trial counsel claims was not an unreasonable determination of the facts nor was it contrary to or an unreasonable application of

**Ground 4(A): Prosecutorial Misconduct**

In Ground 4(A), Petitioner asserts the prosecutor committed misconduct during his closing argument by alluding to evidence outside the record and vouching for the truthfulness of two witnesses. Petitioner raised this claim on direct appeal. (Ex. 9, Doc. 6-1, at 147-52).

In a habeas corpus action, a petitioner must do more than just show erroneous prosecutorial conduct in order to be entitled to relief. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986). There is no standalone right to be free from any "prosecutorial misconduct" in the United States Constitution. Rather, the right sounds in due process. "The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)) (internal quotations omitted). "[T]he remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error." *United States v. Young*, 470 U.S. 1, 12 (1985).

On direct appeal of criminal cases, the Sixth Circuit "has employed its own . . . test to determine whether prosecutorial misconduct require[s] a new trial." *Gumm v. Mitchell*, 775 F.3d 345, 381 (6th Cir. 2014) (internal quotations and citations omitted). However, the Sixth Circuit has also recognized that its "review of alleged prosecutorial misconduct is 'the narrow one of due process, and not the broad exercise of supervisory power that [it] would possess in regard to [its] own trial court.'" *Id.* (quoting *Donnelly*, 416 U.S. at 642). The Supreme Court explained "the *Darden* standard is a very general one, leaving courts 'more leeway . . . in reaching outcomes in

42

case-by-case determinations.'" *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). Thus, on habeas review under AEDPA, courts "must apply the 'highly generalized standard for evaluating [such claims] set forth in *Darden*' and its progeny, not [the Sixth Circuit's] own four-factor test." *Gumm*, 775 F.3d at 378 (quoting *Parker*, 567 U.S. at 48); *see also Ross v. Pineda*, 549 F. App'x 444, 449 (6th Cir. 2013). Prosecutors are permitted to make "reasonable inferences from the evidence" in closing argument. *United States v. Crosgrove*, 637 F.3d 646, 664 (6th Cir. 2011).

Guns R Us

Petitioner raised his prosecutorial misconduct claim on direct appeal (Ex. 9, Doc. 6-1, at 147-52), and the Ohio Supreme Court rejected it:

> 1. The prosecutor asked Officer Mikus on cross-examination whether Obie Crockett "was in the gun rental business." Upon objection, the trial court ordered the jury to disregard the question and answer. In closing argument, the prosecutor referred to Crockett's house as "Guns R Us." Herring argues that this reference went beyond the evidence by implying that Crockett was a gun dealer and that that was the reason he was found with the murder weapon, and not because he was the one who had used it in the robbery. However, the evidence showed that Herring obtained a variety of guns from a house on Laclede Avenue—inferably Crockett's, since that was where police found the murder gun. This provided factual support for the "Guns R Us" comment.

*Herring I*, 94 Ohio St. 3d at 260.

In arguing this decision was an unreasonable determination of the facts and unreasonable application of federal law, Petitioner points to the following exchange between the prosecutor and Officer Mikus earlier in the trial:

> Q:      Did you know, or did you know at that time whether or not Mr. Crocket, that's Obie Crockett, was in the gun rental business? * * * Was he in the gun rental business?
>
> A:      I have no - -
>
> [DEFENSE

43

COUNSEL]: Objection. Move for a mistrial.

[discussion at sidebar and in chambers]

THE COURT: Ladies and gentlemen, you are instructed to disregard the last question and answer posed by counsel and the answer from the witness.

(Tr. 4361, 4368, Doc. 7-20, at 98, 105). Petitioner then argues the prosecutor committed misconduct in his closing argument by alluding to this "evidence which the trial court had previously instructed the jury to disregard." (Doc. 9, at 62). In closing, the prosecutor argued:

You think he didn't know where he was going? You think he didn't know what he was going to do? He had the mask with him. It's hard, plastic mask, according to Debbie Aziz. It's not something you kind of fold up and carry around in your pocket. He knew what he was doing. He went to the house on Laclede, surprise, surprise, and comes out with the guns. Where is this gun ultimately found? On Obie Crockett by Officer Mikus. On a house on Laclede. Guns are [sic] us.

(Tr. 4425-26, Doc. 7-20, at 162-63).

As the Ohio Supreme Court found, however, there was factual support Petitioner obtained several guns from a house on Laclede Avenue – including a 9mm. *Herring I*, 94 Ohio St. 3d at 246 ("Herring went inside the blue house [on Laclede] and came back with four guns."). And there was factual support that the 9 mm firearm used in the murder was found in the home of Obie Crockett on Laclede Avenue. *Id.* at 248. And, even to the extent the prosecutor's remark could be seen as improper, it was not so pervasive or misleading to affect the fairness of the trial. In these circumstances, the undersigned cannot find the state court's determination on this issue unreasonable or that "the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. 637). The state court's decision that this single off-handed remark did not rise to the level of prosecutorial misconduct denying Petitioner due process was not "so lacking in justification that

44

there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Parker*, 567 U.S. at 47-48 (quoting *Harrington v.*, 562 U.S. at 103).

<u>Vouching</u>

Next, Petitioner contends the prosecutor improperly vouched for the credibility of witnesses and co-defendants Allen and Dalton. Respondent contends the Ohio court's determination on this issue was not contrary to law or unreasonable.

It is improper for a prosecutor to express his own personal opinions as to a witness's credibility. *United States v. Young*, 470 U.S. 1, 9-10 (1985); *Hodge v. Hurley*, 426 F.3d 368, 378 (6th Cir. 2005). Such statements are improper because they can convey the impression that the prosecutor has evidence not presented to the jury that supports the charges against the defendant, and because the prosecutor's opinion may induce the jury to trust the government's judgment rather than its own. *Young*, 470 U.S. at 18-19; *Cristini v. McKee*, 526 F.3d 888, 901 (6th Cir. 2008). The test for improper vouching for a witness is whether the jury could reasonably believe that the prosecutor was expressing a personal belief in the witness' credibility. *United States v. Causey,* 834 F.2d 1277, 1283 (6th Cir. 1987). "[G]enerally, improper vouching involves either blunt comments, or comments that imply that the prosecutor has special knowledge of facts not in front of the jury or of the credibility and truthfulness of witnesses and their testimony." *See United States v. Francis,* 170 F.3d 546, 550 (6th Cir. 1999) (internal citations omitted). Even on direct appeal from a federal conviction, the Sixth Circuit has held that, to constitute reversible error, a prosecutor's alleged misconduct of arguing his personal belief, in a witness' credibility or in a defendant's guilt, must be flagrant and not isolated. *See United States v. Humphrey,* 287 F.3d 422, 433 (6th Cir. 2002). Further, even if statements are improper, "the Sixth Circuit has recognized that improper vouching is rarely sufficient to be afforded habeas relief." *Skidmore v. Kelly*, 2012

WL 5197251, at *4 (N.D. Ohio) (citing *Byrd v. Collins*, 209 F.3d 486, 537 (6th Cir. 2000) (collecting cases)).

The Ohio Supreme Court considered and rejected Petitioner's prosecutorial vouching claim:

> 2. Herring accuses the prosecutor of improperly vouching for two of his witnesses, Kitwan Dalton and Louis Allen. During closing arguments, the prosecutor said that Dalton did not lie in a videotaped statement to police the day after the murders and that Allen had lied to police but only about his own involvement.
>
> The prosecutor's statements were based on the trial testimony, not on his personal evaluation of credibility. Dalton testified that on the day after the murders he gave the police a videotaped statement. Dalton testified that this statement was truthful and voluntary, that he had no agreement with the state at that time, and that the police had promised him nothing. Thus, when the prosecutor said that Dalton did not lie in the videotaped statement, he was not vouching for Dalton's testimony; he was simply repeating it.
>
> Similarly, the prosecutor explicitly based his reference to Allen upon Allen's testimony. The prosecutor said: "[A]s Louis Allen told you, the only thing he lied about was himself. He told them he didn't go into the bar, and he didn't have a gun. He didn't lie about the rest of them. He didn't lie about this guy. * * * And he said that." This assertion did not ask the jury to rely on the prosecutor's opinion of Allen's credibility.
>
> 3. Finally, Herring argues that the prosecutor improperly vouched for Dalton and Allen by stating, in response to defense arguments, that he "told them if they don't tell the truth they got no deal, they've got to go to prison." But Herring did not object, so the issue is waived. See *State v. Williams* (1997), 79 Ohio St.3d 1, 12, 679 N.E.2d 646, 657.

*Herring I*, 94 Ohio St. 3d at 261.

Petitioner contends the Ohio Supreme Court's determination on this issue was both an unreasonable determination of the facts in light of the evidence, and an unreasonable application of federal law. The undersigned disagrees. The prosecutor's comments about Dalton and Allen's credibility did not amount to improper vouching, because the prosecutor's statements were based on Dalton and Allen's own testimony as to the truthfulness of their statements. And, contrary to

Petitioner's argument that the prosecutor improperly relied upon videotaped statements not in evidence, these comments were based upon Dalton and Allen's own testimony that they gave such statements to the police and that these statements were truthful. Further, he commented on circumstances surrounding those statements suggesting truthfulness. The prosecutor's statements were thus reasonable inferences from the trial testimony, and do not imply that the testimony was corroborated by evidence known to the prosecutor but not known to the jury. Further, even if the statements could be viewed as improper, the undersigned cannot find the state court's determination on this issue unreasonable or that "the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. 637). The state court's decision so finding was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Parker*, 567 U.S. at 47-48 (quoting *Richter*, 562 U.S. at 103). As such, the undersigned recommends Ground 4(A) be denied.

**Ground 5: *Batson* Challenge**

In Ground 5, Petitioner contends the state peremptorily removed an African-American prospective juror because of her race in violation of the Equal Protection Clause and *Batson v. Kentucky*, 476 U.S. 79 (1986). Respondent contends the state court's determination of this issue was not an unreasonable determination of the facts nor contrary to or an unreasonable application of federal law.

"[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Batson v. Kentucky*, 476 U.S. 79, 89 (1986). That is, "[p]urposeful racial discrimination in section of the venire violates a defendant's right to

47

equal protection because it denies him the protection that a trial by jury is intended to secure. *Id.* at 86. The trial court's determination whether the prosecutor is using his peremptory challenges for that improper reason involves three steps. "[O]nce the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two)." *Purkett v. Elem*, 514 U.S. 765, 767 (1995). Step two does not demand an explanation that is "persuasive, or even plausible," so long as it is facially race-neutral. *Id.* at 767–68. Although the standard to be met at this point may be low, the prosecutor is limited to the explanation he gives. No matter that the trial court or an appellate court may think of better, more plausible, more constitutionally acceptable reasons for the strike, the only explanation to be analyzed is the explanation the prosecutor in fact gave. *See Miller–El v. Dretke*, 545 U.S. 231, 252 (2005) (citing *Miller–El v. Cockrell*, 537 U.S. 322, 339 (2003)); *see also Cockrell*, 537 U.S. at 338. If step two is satisfied, "the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination." *Elem*, 514 U.S. at 767. The critical question here is "the persuasiveness of the prosecutor's justification for his peremptory strike," *Cockrell*, 537 U.S. at 338–39—quite simply, whether the trial court finds the prosecutor's race-neutral explanations credible or pretextual. *See id.* at 339.

Further, the Sixth Circuit has explained that "[i]n addition to the highly deferential standard AEDPA imposes, *Batson* claims are also subject to highly deferential review." *Bryan v. Bobby*, 83 F.3d 1099, 1110 (6th Cir. 2006). The court further explained:

> The trial court's decision on the ultimate question of improper discriminatory intent is a finding of fact to be accorded "great deference." *Hernandez v. New York*, 500 U.S. 352, 364–65, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality). "Deference is necessary because a reviewing court, which analyzes only the transcripts from *voir dire*, is not as well positioned as the trial court is to make credibility determinations." *Cockrell*, 537 U.S. at 339, 123 S.Ct. 1029; *see also Hernandez*,

48

500 U.S. at 365, 111 S.Ct. 1859 ("[E]valuation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.' ") quoting *Witt*, 469 U.S. at 428, 105 S.Ct. 844. In addition, a *Batson* claim "presents a mixed question of law and fact and 'necessarily focuses on the reasonableness of the decision of the state courts....'" *Braxton*, 561 F.3d at 458 (quoting *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003)). The "question of 'whether a prosecutor intended to discriminate on the basis of race in challenging potential jurors is, as *Batson* recognized, a question of historical fact.'" *Lancaster*, 324 F.3d at 429 (quoting *Hernandez*, 500 U.S. at 367, 111 S.Ct. 1859). Thus, the deference given to district courts "must be modified in the context of a § 2254 petition to give credence to § 2254(e)(1)'s requirement that facts found by a state court be presumed correct unless the petitioner rebuts this presumption by clear and convincing evidence." *Braxton*, 561 F.3d at 458 (citing *Lancaster*, 324 F.3d at 429 n.1).

*Id.* at 1110-11.

Petitioner raised this claim to the Ohio Supreme Court on direct appeal (Ex. 9, Doc. 6-1, at 113-20), and the court rejected it as follows:

In his sixth proposition of law, Herring claims that the prosecutor peremptorily challenged a black prospective juror because of her race, which if true would violate the Equal Protection Clause. See *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69. However, the trial court concluded that the prosecutor had not engaged in racial discrimination.

A court decides a *Batson* claim in three steps. First, the opponent of the peremptory strike must make a prima facie case of racial discrimination. Second, if the trial court finds that the opponent has fulfilled this requirement, then the proponent of the strike must come forward with a racially neutral explanation for the strike. *Id.* at 96–98, 106 S.Ct. at 1723–1724, 90 L.E.2d at 87–89. The "explanation need not rise to the level justifying exercise of a challenge for cause." *Id.* at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88.

Third, if the proponent puts forward a racially neutral explanation, the trial court must decide, on the basis of all the circumstances, whether the opponent has proved purposeful racial discrimination. *Id.* at 98, 106 S.Ct. at 1724, 90 L.Ed.2d at 88–89; *Purkett v. Elem* (1995), 514 U.S. 765, 767, 115 S.Ct. 1769, 1770–1771, 131 L.Ed.2d 834, 839; *State v. White* (1999), 85 Ohio St.3d 433, 436, 709 N.E.2d 140, 147. The burden of persuasion is on the opponent of the strike. *Purkett,* 514 U.S. at 768, 115 S.Ct. at 1771, 131 L.Ed.2d at 839.

The original venire had included twenty-six black veniremembers, but only three were left after challenges for cause. The state peremptorily challenged two of those

49

three, using one-third of its six challenges on black veniremembers, resulting in an all-white jury. The trial court overruled a defense *Batson* objection to these strikes.

However, the original jury was later discharged for an unrelated reason, and a new venire was called. In the second venire, after challenges for cause, two of the thirty-two remaining veniremembers were black. This time, the state used only three peremptories. One was used to remove a black veniremember. The state also waived peremptories with one black left on the venire. As a result, although the jury was all white, one of the alternate jurors was black.

The trial court found that the defense had made a prima facie case (a ruling the state does not challenge) and required the prosecutor to explain why he struck the black venireman.

The prosecutor gave several racially neutral reasons for striking the juror. First, he regarded her as "not too bright," inasmuch as "[h]er hobbies are eating, doing hair and watching Oprah." (The prosecutor's statements about the juror's hobbies and background appear to be based on the jury questionnaire. The questionnaire is not in the record, but the trial judge reviewed it in ruling on the *Batson* objection.) Second, he believed that the juror "flouts society's conventions." He noted that "[s]he had her first child at 16. She's had three children, no husbands." He also believed that she was a transient because "[s]he lives at one of the missions" and "[i]t took your [the court's] office three days to find" her. Third, the prosecutor considered the juror "soft on the death penalty" based on her voir dire and her jury questionnaire, in which "she checked a block where there are no crimes" that warrant the death penalty.

The trial court found that the defense had not proved that the prosecutor had excused the veniremember because of her race. He accordingly overruled the *Batson* objection and dismissed her. The finding of the trial court, because it turns largely on the evaluation of credibility, is entitled to deference on appeal and will not be reversed unless clearly erroneous. *White, supra,* 85 Ohio St.3d at 437, 709 N.E.2d at 148, quoting *Batson,* 476 U.S. at 98, 106 S.Ct. at 1724, 90 L.Ed.2d at 89, fn. 21; *State v. Hernandez* (1992), 63 Ohio St.3d 577, 583, 589 N.E.2d 1310, 1314. The prosecutor's belief that the prospective juror was "soft on the death penalty" has support in the record. The juror stated: "I don't think I could" vote to recommend death. She later said, "I have no reason not to" abide by the judge's instructions. Nevertheless, her initial response "certainly indicated some degree of opposition to capital punishment," and "it is highly likely that such an attitude made her undesirable to the prosecution." *State v. Murphy* (2001), 91 Ohio St.3d 516, 529, 747 N.E.2d 765, 786.

Herring contends that "there were a suspiciously low number of minorities available on the panel." Even if true, that contention throws no light on whether the prosecutor committed purposeful discrimination.

Herring contends that the state's *waiver* of four peremptories, with one black remaining on the venire, supported an inference that the prosecutor was trying to keep blacks off the jury. The argument, while not entirely clear, seems to be that the black veniremember could have been on the jury only if the state had used all four of its remaining peremptories on other jurors. Even if the record supported this claim, it provides no reason to infer purposeful discrimination.

The evidence Herring relies upon to support his discrimination claim fails to demonstrate that the trial court's finding, under the totality of the circumstances, was clearly erroneous. Accordingly, Herring's sixth proposition of law is overruled.

*Herring I*, 94 Ohio St. 3d at 255–57.

Petitioner cites several federal criminal cases in which a district court's analysis at *Batson*'s step three was held to be insufficient. *See* Doc. 9, at 72 (citing *United States v. McAllister*, 693 F.3d 572, 580 (6th Cir. 2012); *United States v. Hill*, 146 F.3d 337, 342 (6th Cir. 1998)). However, these decisions on direct appeal do not involve the same additional layer of AEDPA deference applicable here, to a state habeas case.

The Ohio Supreme Court here cited the applicable constitutional law, *Batson*, and progressed through the three-step analysis. Thus, the question for the undersigned is whether it was unreasonable for the Ohio Supreme Court to find the prosecutor's race-neutral reason for striking Juror Gardner at step three was supported. The Ohio Supreme Court recognized the prosecutor offered several reasons for excusing the juror, but focused on the prosecutor's belief that the juror was "soft on the death penalty", noting it "ha[d] support in the record." *Herring I*, 94 Ohio St. 3d at 256. Opposition to the death penalty is a race-neutral reason, *see, e.g., United States v. Lawrence*, 735 F.3d 385, 443 (6th Cir. 2013), and Petitioner does not seem to challenge this. Rather, he challenges the determination on the basis of the facts, arguing "Juror Gardner was not 'soft on the death penalty'" and "other white, seated jurors also demonstrated more hesitation than Ms. Gardner in their answers concerning whether or not they could impose the death penalty."

(Doc. 9, at 75). Petitioner points to two additional jurors who were seated, but also demonstrated hesitation regarding the death penalty.

As the Ohio Supreme Court recognized, Juror Gardner stated she did not think she could vote to recommend death:

> Q: I want to know if you, yourself, are capable of sitting on a jury with 11 other people, whether you, yourself, can participate in deliberation with 11 other people, should you make certain findings, whether you, yourself, could come back with a sentence of death, whether you, yourself, can sign a death verdict.
>
> A: I don't think I could.

(Tr. 3073, Doc. 7-13, at 213). The Ohio Supreme Court cited this exchange and also recognized Juror Gardner's later testimony that she could follow the judge's instructions. *Herring I*, 94 Ohio St. 3d at 257; *see also* Tr. 3078, Doc. 7-13, at 218 (Q: If his instructions lead you to a death verdict, you will abide by the Judge's instruction?" A: Yes. I have no reason not to."). Nonetheless, the Ohio Supreme Court noted "her initial response 'certainly indicated some degree of opposition to capital punishment,' and 'it is highly likely that such an attitude made her undesirable to the prosecution.'" *Herring I*, 94 Ohio St. at 257 (quoting *State v. Murphy*, 91 Ohio St. 3d 516, 529 (2001)).

The undersigned disagrees with Petitioner's characterization that other jurors necessarily demonstrated "*more* hesitation than Ms. Gardner." (Doc. 9, at 75) (emphasis added). One juror after indicating "hesitation", stated she "could if [she] had to" impose the death penalty. (Tr. 2425-26, Doc. 7-11, at 26-27). Later, after expressing that she did not know if she was capable of voting for the death penalty, "to tell you the honest truth", she stated, "I would understand I would have to do that", "I could, I guess, if I had to", and "I could do it." (Tr. 2338-40; Doc. 7-11, at 39-41). And the other juror stated she could not impose the death penalty if the decision were up to her

alone, but "I would think on a jury it's a different situation, and I think I could." (Tr. 2978, Doc. 7-13, at 117).

Given the deference applicable in the first instance to the trial court's determination of the historical fact of whether the prosecutor committed purposeful racial discrimination, *Lancaster*, 324 F.3d at 429, and the additional level of deference due to the state court's determination on habeas review, *see, e.g, Bryan*, 83 F.3d at 1110.the undersigned concludes Petitioner is not entitled to habeas relief on his *Batson* claim. The question is not what this court would have done if presented with the *Batson* challenge in the first instance, but rather the reasonableness of the state court determination.

Therefore, the undersigned recommends the Court find the Ohio Supreme Court's decision on Petitioner's *Batson* claim was not contrary to or an unreasonable application of, clearly established Federal law, or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d). That is, "the state court's ruling on the claim being presented in federal court was [not] so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

## CONCLUSION AND RECOMMENDATION

Following review, and for the reasons stated above, the Court recommends the Petition be DENIED in its entirety.

s/James R. Knepp, II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time

WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).